Filed 3/22/22  In re A.K. CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIRST APPELLATE DISTRICT

### DIVISION FOUR

| | |
|---|---|
| In re A.K., a Person Coming Under the Juvenile Court Law. | |
| ALAMEDA COUNTY SOCIAL SERVICES AGENCY,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>N.M.,<br><br>     Defendant and Appellant. | A162558<br><br>(Alameda County Super. Ct. No. JD-027697-02) |

N.M. (mother) appeals from a juvenile court order terminating her parental rights as to her son, A.K. (the minor), at a hearing under Welfare and Institutions Code section 366.26.[1] After the juvenile court entered its order, the California Supreme Court issued its decision in *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*), in which it clarified the relevant considerations for the beneficial relationship exception (§ 366.26, subd. (c)(1)(B)(i))

_____

[1] Subsequent undesignated statutory citations are to the Welfare and Institutions Code.

1

to the presumption favoring termination of parental rights of an adoptable child and placement of a child for adoption. Mother now argues the juvenile court's finding that the beneficial relationship exception did not apply is inconsistent with *Caden C.* Mother further challenges the juvenile court's denial of her request for bonding studies of the minor's relationship with her and his siblings, which *Caden C.* encouraged juvenile courts to allow; its decision to exclude testimony by two of the minor's siblings that she wanted to offer to prove the sibling relationship exception (§ 366.26, subd. (c)(1)(B)(v)); the sufficiency of the evidence supporting its ruling that the minor was adoptable; and, assuming it applied the correct legal standards, its conclusion under those standards that mother had not shown the beneficial relationship or sibling relationship exceptions.

We agree with mother that the juvenile court relied on certain factors that *Caden C.* made clear are not relevant to the application of the beneficial relationship exception. We will therefore reverse the juvenile court's order and remand for a new section 366.26 hearing consistent with *Caden C.* This disposition makes it unnecessary to address mother's other arguments. However, because continued protracted legal proceedings in this dependency case are contrary to the minor's interest in permanency, we make several observations related to some of those arguments for the guidance of the parties on remand.

## BACKGROUND

The minor was born premature in September 2016 with a positive toxicology screen for opiates and prenatal exposure to

2

methadone, and he required morphine to treat his withdrawal symptoms. He was hospitalized for the first seven months of his life. In January 2017, while the minor was still hospitalized, the Alameda County Social Services Agency (Agency) filed a dependency petition due to concerns about mother's 10-year addiction to opiates and the inability of mother and her husband, the minor's father, to understand the minor's serious medical condition. When he was released from the hospital in April 2017, the minor was placed in foster care. In late June 2017, the minor was returned to the home, with the Agency providing family maintenance services and father supervising mother. The juvenile court dismissed the dependency case in December 2017.

The minor was detained in late March 2018, and the Agency filed a second dependency petition alleging that the minor was a medically fragile child who had been diagnosed with " 'oral [a]version, motor delay, global hypertonia, reflux, and [was] G-Tube dependent.' " (*In re [A.]K.* (Aug. 18, 2020, A159443) [nonpub. opn.] (*A.K.*).) The minor was "placed in foster care after mother admitted she was overwhelmed and needed help because father had recently abandoned her and the children. In May 2018, mother reported that father had left the country with one of their five children, leaving her and the other children homeless and with no means of support." (*Ibid.*) In September 2018, the juvenile court sustained the jurisdictional allegation that mother was unable to meet the minor's basic needs. In November 2018, the minor's placement was changed to a " 'Non Related Extended

3

Family Member,' " a couple who had a good relationship with the minor's maternal grandparents. (*Ibid.*)

"In March 2019, the Agency recommended that the court terminate mother's reunification services at the six-month status review. Mother had not been consistent about attending [the minor]'s medical appointments, was not compliant in therapy, and appeared to have untreated mental health issues. She did not understand why [the minor] was removed from her care despite the social worker's efforts to explain the Agency's concerns. And her lack of comprehension about [the minor]'s medical needs impacted her ability to demonstrate that she could care for him.

"A contested review hearing was scheduled for June 2019. Meanwhile, the Agency reported ongoing concerns about mother and her inability to care for [the minor]. She did not regularly attend [the minor]'s medical appointments and was often disruptive when she did attend. [The minor]'s gastroenterologist opposed reunification because [the minor] experienced distress when mother was present. Mother's supervised visits were not consistently positive; she did not follow the Agency rules, brought inappropriate food, and was not careful with [the minor]." (*A.K., supra*, A159443.)

At the contested review hearing, the agency presented testimony that "mother never demonstrated an ability to use the G-tube to feed [the minor]; mother consistently maintained that [the minor] could eat food, ignoring that his oral aversion made him throw up food that he ate; and mother did not pay attention

to doctors who attempted to explain [the minor]'s medical condition." (*A.K., supra*, A159443.) The minor had lost weight and been hospitalized several times when he lived with mother, and after the minor was removed, mother fed the minor inappropriate foods at supervised visits, which made him sick. (*Ibid.*)

In September 2019, after the conclusion of the contested review hearing, "the juvenile court found, among other things, that mother was provided with reasonable reunification services, [the minor] could not be returned safely to mother's care, and there was no substantial probability that [the minor] could or would be returned to mother and safely maintained in her home prior to the date of an 18-month review. The matter was continued for a section 366.26 hearing, to consider terminating parental rights and select a permanent plan for [the minor].

"Mother filed a petition for extraordinary review challenging the September 2019 order setting this case for a section 366.26 hearing. Her writ counsel presented extensive argument in support of two basic claims. First, [the minor] should have been returned to mother's custody at the review hearing. Alternatively, mother was entitled to additional reunification services. [¶] On December 5, 2019, this court denied mother's petition on the merits, affirming the juvenile court's three material findings." (*A.K., supra*, A159443.)

Mother filed a section 388 petition asking the juvenile court to set aside the order setting a section 366.26 hearing and instead order that the minor be returned to her. (*A.K., supra*, A159443.)

5

The juvenile court denied the petition and this court affirmed in August 2020. (*Ibid.*)

On February 18, 2020, the juvenile court held the first day of the section 366.26 hearing. The juvenile court denied mother's January 21, 2020, request for bonding studies of the relationship between the minor, mother, and the minor's siblings. The juvenile court allowed mother to call the minor's oldest sibling to offer testimony related to the sibling relationship exception but denied her request to call the minor's other two siblings to testify on the same topic. Mother filed a notice of appeal of those rulings, but this court dismissed the appeal because the juvenile court's orders were not appealable. (*In re* [A.]*K.* (Dec. 16, 2020, A159758) [nonpub. opn.].)

The juvenile court held the section 366.26 hearing over the course of the next 14 months, with significant delays caused by the COVID-19 pandemic. It heard testimony from the minor's oldest sibling, two social workers, and mother.

In April 2021, the juvenile court found the Agency had provided mother reasonable services, found by clear and convincing evidence that the minor was adoptable, terminated mother's and father's parental rights, and set a permanent plan of adoption for the minor. The court found mother had not proven the beneficial relationship or sibling relationship exceptions to adoption. The court began by making credibility determinations against mother and the oldest sibling. As to the beneficial relationship exception, the court found that mother had, overall, regularly and consistently visited the minor but that

6

she had not demonstrated a parental bond that was so beneficial that it outweighed the benefits of adoption. The court also found the sibling relationship exception inapplicable, because the minor had only lived with his siblings for a short period when he was an infant, they had not consistently visited the minor, and the minor did not have a strong connection to them.

## DISCUSSION

### I. Beneficial relationship exception

#### A. *Legal principles and standard of review*

"At the section 366.26 hearing, the question before the court is decidedly not whether the parent may resume custody of the child. [Citations.] In fact, it is not permissible to order reunification at the section 366.26 hearing. [Citations.] . . . [¶] Instead, the goal at the section 366.26 hearing is 'specifically . . . to select and implement a permanent plan for the child.'" (*Caden C.*, *supra*, 11 Cal.5th at p. 630.) If reunification services have been terminated and the juvenile court finds by clear and convincing evidence that the child is adoptable, "then the court shall terminate parental rights to allow for adoption." (*Ibid.*) "But if the parent shows that termination would be detrimental to the child for at least one specifically enumerated reason, the court should decline to terminate parental rights and select another permanent plan." (*Id.* at pp. 630–631.) "[W]hen a parent establishes that one of the exceptions applies, adoption or termination is not 'in the best interest of the child.'" (*Id.* at p. 631.) One of these exceptions "applies where '[t]he court finds a compelling reason for

determining that termination would be detrimental to the child due to one or more of the following circumstances: [¶] (i) The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship.' (§ 366.26, subd. (c)(1)(B)(i).)" (*Caden C.*, at p. 631.)

A "parent asserting the parental benefit exception must show, by a preponderance of the evidence, three things. The parent must show regular visitation and contact with the child, taking into account the extent of visitation permitted. Moreover, the parent must show that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship. And the parent must show that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Caden C.*, *supra*, 11 Cal.5th at p. 636.)

The Supreme Court's decision in *Caden C.* clarified how juvenile courts should evaluate each of these three elements. The first element is straightforward, requiring a court to consider "whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) On the second element, whether the child has a substantial positive attachment to the parent, a court considers "a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' " (*Ibid.*) It also considers "how children

8

feel about, interact with, look to, or talk about their parents," which "properly focuses the inquiry on the child, even as courts must remain mindful that rarely do '[p]arent-child relationships' conform to an entirely consistent pattern." (*Ibid.*)

On the third element, "[w]hen it weighs whether termination would be detrimental, the court is not comparing the parent's attributes as custodial caregiver relative to those of any potential adoptive parent(s). Nothing that happens at the section 366.26 hearing allows the child to return to live with the parent. [Citation.] Accordingly, courts should not look to whether the parent can provide a home for the child; the question is just whether losing the relationship with the parent would harm the child to an extent not outweighed, on balance, by the security of a new, adoptive home. [Citation.] Even where it may never make sense to permit the child to live with the parent, termination may be detrimental. [Citation.] And the section 366.26 hearing is decidedly not a contest of who would be the better custodial caregiver." (*Caden C.*, *supra*, 11 Cal.5th at p. 634.)

The Supreme Court further clarified that "[a] parent's continued struggles with the issues leading to dependency are not a categorical bar to applying the exception." (*Caden C.*, *supra*, 11 Cal.5th at p. 637.) However, such issues are often relevant. (*Ibid.*) "A parent's struggles may mean that interaction between parent and child at least sometimes has a ' "negative" effect' on the child," which would impact whether the parent's relationship with the child is beneficial and positive. (*Ibid.*) A parent's struggles with "issues such as those leading to dependency may

9

also be relevant to the detriment from terminating parental rights." (*Ibid.*)  Nonetheless, such issues "are relevant only to the extent they inform the specific questions before the court:  would the child benefit from continuing the relationship and be harmed, on balance, by losing it?" (*Id.* at p. 638.)  Thus, in *Caden C.*, the Supreme Court found the Court of Appeal erred in holding that a mother's failure to achieve sobriety and address her mental health issues meant the beneficial relationship exception did not apply, because the Court of Appeal did not conclude that such issues affected whether the mother's relationship with the child was beneficial or whether its loss would be detrimental. (*Id.* at pp. 641–642.)

We review a juvenile court's determination on the first and second elements, consistent visitation and existence of a beneficial relationship, for substantial evidence. (*Caden C.*, *supra*, 11 Cal.5th at pp. 639–640.)  We likewise review for substantial evidence the factual determinations underlying the juvenile court's balancing of the detriment from the loss of the relationship against the benefits of placement in an adoptive home, but we review for abuse of discretion the ultimate decision of "whether termination of parental rights would be detrimental to the child due to the child's relationship with his parent." (*Id.* at p. 640.)  These standards are identical for practical purposes, however, since the hybrid standard of review "simply embodies the principle that '[t]he statutory scheme does not authorize a reviewing court to substitute its own judgment as to what is in the child's best interests for the trial court's

10

determination in that regard, reached pursuant to the statutory scheme's comprehensive and controlling provisions.'" (*Id.* at p. 641.)

### A. Additional background

The juvenile court began its ruling by finding that mother and the minor's oldest sibling were not credible witnesses, while the social workers were credible. As to mother, the court explained that it believed mother loved the minor very much and would say and do anything to avoid a ruling against her. The court further found mother embellished a bit to try to illustrate a parental bond with the minor, and the court suspected that mother at one point was looking at some written material to answer questions. The court described how, after mother at one point emailed a picture of the minor's erect penis to the former foster mother, she explained that she thought it was funny, but at the hearing she said she took the picture because she wanted to consult a doctor about the minor's precocious growth of public hair. Mother's inconsistent explanations caused the juvenile court to question mother's recollection of events.

The juvenile court concluded the evidence was "overwhelming" that mother had not demonstrated a sufficient parental bond. The court acknowledged that mother had, overall, regularly visited the minor, although it observed that mother's visitation had been "quite inconsistent" until 2020, when visits were conducted by video for a time. The court then summarized the history of the two dependency petitions, which resulted in the minor living with mother and siblings for approximately one of

11

his four and a half years of life. The court found this weighed heavily in favor of terminating mother's parental rights.

The court then found the evidence of mother's visits with the minor failed to show any connection between mother and the minor. The court noted that mother asked the minor at countless visits who his mother and siblings were and told the minor she was his mother, and the court construed this as demonstrating that mother herself knew and felt the lack of connection. The court also noted that the minor was not interested in this kind of discussion and seemed confused or indifferent at times. The court said that when mother asked the minor to kiss "mommy jon," which is a term in mother's native language, Dari, that means "dear mother" or "mom[,] my love," the minor would kiss the caregiver.

The court found that an incident in which the minor fell in a lake during one visit encapsulated mother's relationship with the minor. The court recounted how after the minor fell in and mother pulled him out of the lake, the social worker had to calm mother down. The court highlighted the fact that mother was shouting in front of the minor that he could have died. The court said the incident showed that mother did not have a parental bond and needed support from the social worker. The court concluded that mother's shouting in a frightened manner did not show a parental bond because mother should have been focused on calming the minor to avoid triggering him or making him more upset. The court further observed that after the incident, the minor did not seek comfort from mother. Instead, the minor

appeared to hold in his feelings until he rejoined the caregiver, at which point he leaped into her arms and began sobbing. The juvenile court concluded from this that the minor did not look to mother for care, comfort, and nurturing.

The juvenile court then turned to other incidents dating back to the beginning of the dependency in 2018 in which mother acted erratically, failed to properly supervise or feed the minor, and left visitation centers, which suggested to the court that mother was using substances during visitation time. The court found that leaving the minor to go use drugs was the antithesis of a parental bond. The court mentioned that there were several visits where mother was not interested in interacting with the minor and instead seemed more interested in chatting with the interpreter. The juvenile court also mentioned an incident in February 2019 in which mother disciplined the minor for biting her but the social worker believed mother was reinforcing negative behavior towards the minor. Additionally, the court determined that mother was unable to meet the minor's physical needs, based on the fact that she had been excluded from attending the minor's medical appointments earlier in the case for being disruptive, she was unable or unwilling to learn how to care for the minor's medical conditions, and mother fed the minor so much, including candy, that he vomited.

After concluding mother could not meet the minor's physical needs, the court found the same regarding the minor's emotional needs. The court then said it did not see evidence that a parental bond and relationship was so beneficial that it

13

outweighed adoption. As support for this conclusion, the juvenile court recited the caregiver's descriptions of visits in which the minor seemed indifferent to mother and hung up the phone when mother asked him for hugs and kisses. The court also cited an incident from January 2021 in which mother said to the minor, "Why don't you come visit us? You don't love us. I'm your mommy, she is not your mommy." The court found these types of statements would be psychologically burdensome for the minor. The court further recounted "some insensitive and troubling words" mother spoke to the minor, when mother told the minor, "If my cat doesn't listen to me I'm going to beat it up," implying that if the minor did not listen to her then mother might beat him. The court was not sure what to make of such statements, except that perhaps mother was frustrated and felt the minor slipping away from her. The court rejected as baseless mother's argument that the caregiver's description of the visits was biased, finding instead that mother's more favorable descriptions of the visits reflected an attempt to convince the court that the visits were different than they were.

Finally, the court agreed with the minor's counsel that mother could be a lot of fun for the minor over short periods of time but found that was not sufficient to meet the standard of a parental bond that would require the court not to terminate mother's parental rights.

## B. Analysis

The juvenile court ruled before *Caden C.* was decided, but its ruling maps fairly well onto *Caden C.*'s three elements, with

14

the court finding mother visited consistently, did not have any connection with the minor, and mother's relationship with the minor was not so beneficial that it outweighed the benefits of adoption.  However, several of the factors that the juvenile court recited as support for the latter two of these findings are improper under *Caden C.*

First, the juvenile court's consideration of the lake incident is appropriate under *Caden C.* to some extent, since the incident reflected how the minor interacted with and looked to mother. (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)  The minor's refusal to seek or accept comfort from mother during that incident is revealing of the nature of their relationship.  However, the juvenile court's statement that mother was not exhibiting "parental" behavior during the lake incident gives us pause. After *Caden C.*, it is no longer helpful to evaluate at a section 366.26 hearing whether a parent's relationship with a minor is "parental."  *In re J.D.* (2021) 70 Cal.App.5th 833, 864 pointed out that *Caden C.* did not use the word "parental" to describe the nature of the necessary relationship.  (See *Caden C.*, *supra*, 11 Cal.5th at p. 625, fn. 2 [noting that it would use the phrases " 'parental-benefit exception,' 'beneficial parental relationship exception,' and 'beneficial relationship exception' . . . merely for ease of reference" and not to "reflect any substantive determination about the requirements to prove the exception"].) *J.D.* further found the word "vague and unhelpful in this context" and noted that more than one person can occupy an important emotional role like that necessary to support the beneficial

15

relationship exception.  (*J.D.*, at pp. 864–865.)  However, *J.D.*, at pages 864–865, agreed with an earlier decision, *In re B.D.* (2021) 66 Cal.App.5th 1218, 1230, that to support the beneficial relationship exception, a parent must show his or her relationship is more than that of a " 'mere friend or playmate.' " Similarly, *In re L.A.-O.* (2021) 73 Cal.App.5th 197, 211 said the "X factor" that takes a relationship from being merely a friendly visitor, which is not sufficient for the exception, to a more significant one that can support the exception is "mysterious." But the court still found the phrase "parental role" ambiguous and thought it better not to use the words at all, in part because *Caden C.* did not.  (*Ibid.*; but see *In re A.L.* (2022) 73 Cal.App.5th 1131, 1157.)

Even assuming the descriptor "parental" retains some value, the juvenile court's analysis of whether mother was acting in a parental role during the lake incident does not show whether it was "mindful that rarely do '[p]arent-child relationships' conform to an entirely consistent pattern." (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)  It is not necessarily significant that mother was upset and needed support from the social worker.  Many parents would reasonably become emotional in such a moment and be unable to calm down instantly.  Besides, *Caden C.* repeatedly emphasized that a juvenile court's evaluation of the beneficial relationship exception must be focused on the child. (*Id.* at p. 632.)  Thus, if mother's emotional response were excessive and destabilizing for the minor, that would be relevant to deciding whether the minor's relationship with mother was,

16

overall, beneficial.  But the court did not make such a finding and the evidence does not support it, since the record shows the minor became upset only after mother tried to take off his clothes, not merely from seeing or hearing mother's emotional reaction.  Nor was it necessarily inappropriate for mother to acknowledge to the minor that he had been in significant danger, as he assuredly was when he fell into water over his head.  Minimizing the gravity of the incident to soothe the minor, as the social worker did, is one choice in such an instance, but not the only one.  (Cf. *In re J.D.*, *supra*, 70 Cal.App.5th at p. 869 [parent could legitimately choose to discuss financial pressures with a young child for variety of reasons, such as "minimizing shame, . . . fostering resilience, promoting financial responsibility, or simply exposing a child to the vicissitudes of life"].)  Despite the juvenile court's disclaimer at the outset that it was not evaluating mother as a parent, its discussion of the lake incident appears to have done just that.

Second, the court's reliance on much of the evidence of mother's behavior and inability to meet the minor's physical needs during visits earlier in the case is also contrary to *Caden C*. *Caden C.* held that a "parent's continued struggles with the issues leading to dependency are not a categorical bar to applying the exception," and such issues "are relevant only to the extent they inform the specific questions before the court:  would the child benefit from continuing the relationship and be harmed, on balance, by losing it?"  (*Caden C.*, *supra*, 11 Cal.5th at pp. 637–638.)  Mother's inability to care for the minor's medical

conditions, which stemmed from her substance abuse, was the reason for the dependency. This inability was not a reason in itself to find mother had not established a beneficial relationship with the minor. The minor certainly does need an adult who can care for him and meet his medical needs, as the juvenile court stated at one point. But the fact that mother cannot provide that care is not dispositive or relevant in itself. Because the court was holding a section 366.26 hearing, there was no possibility that the minor would be returned to mother's care or custody. (*Caden C.*, *supra*, 11 Cal.5th at p. 630 ["it is not permissible to order reunification at the section 366.26 hearing"].) The juvenile court's implicit comparison between mother's and the caregiver's ability to meet the minor's medical needs was not a proper part of the evaluation of the evidence for the beneficial relationship exception. (*Id.* at p. 634 ["When it weighs whether termination would be detrimental, the court is not comparing the parent's attributes as custodial caregiver relative to those of any potential adoptive parent(s). . . . [T]he section 366.26 hearing is decidedly not a contest of who would be the better custodial caregiver"].)

Mother's prior conduct during the dependency case only mattered to the extent that it bore on whether severing the minor's relationship with mother would deprive him of a beneficial relationship. Mother's lack of interaction with the minor at visits or the instances where she left visitation centers during visits were assuredly relevant to this question. Mother's inattention to the minor could well have contributed to the minor

18

not forming a strong bond with her, as the juvenile court surmised.

The agency takes this further and argues that mother's inability to meet the minor's medical needs had a negative effect on the quality of the minor's visits and interactions with mother. Mother's failure to properly feed the minor caused him discomfort, since he vomited after mother and the siblings fed him at some visits. But this fact was not in itself relevant at this stage of the proceedings. To reiterate, the proper consideration at the hearing was the minor's relationship with mother, and the juvenile court did not connect mother's problems feeding and caring for the minor to how the minor viewed mother, such as feelings of fear, resentment, or distrust. Also, as mother points out, many of the incidents the juvenile court highlighted relating to medical appointments, feeding, and vomiting dated to years earlier in the case, when the minor was an infant or young toddler. There were no reports of this type of behavior during mother's recent visits from March 2020 onwards, likely because mother's visits were either video visits due to the pandemic or were held in a park during which mother did not feed the minor. Thus, there is no indication that mother's handling of the minor's medical issues had a lasting impact on their relationship. (*In re J.D.*, *supra*, 70 Cal.App.5th at p. 863 [reversing order terminating parental rights in part because of lack of evidence that parent's misbehavior more than approximately one year before the hearing had a lasting impact on child].)

By the end of the section 366.26 hearing in April 2021, the minor's medical conditions had largely resolved to the point that his feeding tube had been removed. The minor still needed a routine feeding regimen to avoid losing weight and had some other remaining issues, but maintaining a relationship and visitation with mother could not jeopardize his health in the future. No matter how the section 366.26 hearing turned out, mother would not be responsible for the minor's physical health and well-being. (*In re D.M.* (2021) 71 Cal.App.5th 261, 270 [juvenile court's equation of "parental role" with understanding children's medical needs and attending their medical appointments did not support termination of parental rights absent evidence regarding attachment between parent and children].)

The agency also notes that mother's behavior led to a reduction in her visitation time and caused her visits to remain supervised. This is another way of saying mother failed to make progress towards reunifying with the minor, which *Caden C.* instructs is not relevant on its own at a section 366.26 hearing. The fact that mother had not progressed to unsupervised or more frequent visits mattered only to the extent that it affected the minor's overall relationship with her. (*In re J.D., supra,* 70 Cal.App.5th at p. 864 [agency's argument that mother's visits were still supervised "erroneously impl[ied] the court could consider the mere fact she had been unable to succeed in overcoming her parenting struggles as a reason to rule against her regardless of whether or how her son was affected by those

20

shortcomings"].)  If the nature or frequency of visitation meant that mother had a limited relationship with the minor, the juvenile court should have highlighted the evidence of that limited relationship, rather than focusing on mother's failings that led to the visits proceeding as they did.

Because the juvenile court explicitly relied on factors improper under *Caden C.*, remand is necessary.  "A discretionary order that is based on the application of improper criteria or incorrect legal assumptions is not an exercise of informed discretion and is subject to reversal even though there may be substantial evidence to support that order." (*Mark T. v. Jamie Z.* (2011) 194 Cal.App.4th 1115, 1124–1125.)  "If the record affirmatively shows the trial court misunderstood the proper scope of its discretion, remand to the trial court is required to permit that court to exercise *informed* discretion with awareness of the full scope of its discretion and applicable law." (*F.T. v. L.J.* (2011) 194 Cal.App.4th 1, 26.)  This principle applies here because the juvenile court's errors fundamentally affected its inquiry into whether mother established a beneficial relationship. "[W]e cannot determine on this record that the juvenile court's ruling complied with the principles announced in the Supreme Court's decision.  Although we recognize it is in [the minor's] interest to expeditiously select his permanent plan, the interests at stake when parental rights are terminated are of the utmost importance to both parent and child, and proper consideration of the factors deemed relevant by our dependency scheme is vital." (*In re J.D.*, *supra*, 70 Cal.App.5th at p. 840.)

21

The Agency resists this conclusion by claiming the juvenile court did not rely heavily on mother's failure to address the minor's medical needs. The Agency portrays the juvenile court's concern on that score as one of many that supported its decision and therefore distinguishes this case from *In re B.D.*, *supra*, 66 Cal.App.5th at pages 1228–1229. *In re B.D.* reversed an order terminating parental rights where "the juvenile court relied heavily, if not exclusively," on the parents' failure to complete their reunification plans, despite the social services agency's argument that substantial evidence supported the lower court's order. (*Ibid.*) The juvenile court here did say the evidence was "overwhelming" that mother had not demonstrated a sufficient parental bond, and it certainly had many reasons why it ruled against mother on this issue. However, the lake incident and mother's failures earlier in the dependency comprised nearly half of the juvenile court's discussion of the reasons for its ruling, so the improper factors the juvenile court relied on were not a minor or insignificant aspect of its decision.

More importantly, the relevant question is not whether substantial evidence in the record supports an order terminating mother's parental rights under a proper application of the beneficial relationship exception consistent with *Caden C.* Because the juvenile court's understanding of what constitutes a beneficial relationship and what evidence is relevant to proving such a relationship was different from what *Caden C.* later announced, we cannot rely on the juvenile court's assessment of the weight of the evidence to find the juvenile court's errors to be

22

harmless. Additionally, *Caden C.* provided further instruction for juvenile courts about the value of bonding studies, which bears on mother's request for bonding studies (discussed further, *post*). Under these circumstances, we deem it prudent to remand for the juvenile court to hold a new section 366.26 hearing and exercise its informed discretion based on a proper understanding of the law. We express no opinion on the appropriate outcome of such a hearing, leaving that issue to the juvenile court's discretion.

## II. Mother's additional arguments

Besides challenging the juvenile court's ruling under *Caden C.*, mother raises several other arguments for reversal of the order terminating her parental rights. She contends (1) the juvenile court erred by denying her requests for bonding studies of her and her other children's relationships with the minor; (2) if the juvenile court properly denied her bonding study request as untimely, she received ineffective assistance of counsel; (3) the juvenile court erred when it prevented her from calling two of the minor's siblings to testify about their relationships with the minor for the sibling relationship exception; (4) the juvenile court erred by excluding evidence relating to the minor's adoptability and then finding the minor adoptable; and (5) even if the juvenile court applied the correct legal standards, its findings that the beneficial relationship and sibling relationship exceptions did not apply were error and in violation of mother's due process rights.

Our conclusion that the juvenile court's order must be reversed and it must hold a new hearing makes it unnecessary to address these arguments. However, mother may well renew

23

some of her previous requests and attempt to introduce similar evidence at the new hearing.  This dependency case has already been pending for a considerable time, and continued protracted legal proceedings are contrary to the minor's interest in permanency.  Accordingly, we offer some observations about the arguments that are likely to remain relevant on remand, to offer guidance for the parties and minimize the possibility that further proceedings could lead to another appeal.

## A. Bonding studies

Evidence Code section 730 empowers a juvenile court to appoint a fact-finding expert witness to study the bond between a parent and child.  (*In re Jennifer J.* (1992) 8 Cal.App.4th 1080, 1084.)  Such a bonding study analyzes the strength and nature of the relationship between the parent and child, which can be relevant at a hearing under section 366.26 to the question of whether the beneficial parent-child relationship exception to termination of parental rights in section 366.26, subdivision (c)(1)(B)(i) applies.  (Cal. Juvenile Dependency Practice (Cont.Ed.Bar 2020) § 8.33.)  Bonding studies are also relevant to the sibling benefit exception, especially when young children who are less articulate are involved.  (*In re Jacob S.* (2002) 104 Cal.App.4th 1011, 1018, disapproved of on other grounds by *In re S.B.* (2009) 46 Cal.4th 529.)  "In a case where the strength of a bond between very young siblings is difficult to determine because of the young age of the children involved, court-ordered sibling bond studies may be appropriate.  Such studies would be helpful—in some cases might even be

indispensable—in determining the applicability of section 366.26, subdivision (c)(1)[(B)(v)]."[2] (*In re Jacob S.*, at p. 1018.) However, "[t]here is no requirement in statutory or case law that a court must secure a bonding study as a condition precedent to" terminating parental rights. (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1339.) "The applicable standard of review is whether, under all the evidence viewed in a light most favorable to the juvenile court's action, the juvenile court could have reasonably refrained from ordering a bonding study." (*Id.* at p. 1341.)

*Caden C.* emphasized the importance of bonding studies for evaluating the beneficial relationship exception. (*Caden C.*, *supra*, 11 Cal.5th at pp. 632–633.) In its discussion of the second element, a beneficial relationship, the Supreme Court remarked, "As in this case, often expert psychologists who have observed the child and parent and can synthesize others' observations will be an important source of information about the psychological importance of the relationship for the child." (*Ibid.*) In a footnote, the Court went even further, noting that both the juvenile court and Court of Appeal in that case had found the bonding study in that case informative and instructing, "Trial courts should seriously consider, where requested and

---

[2] The sibling relationship exception was formerly codified at section 366.26, subdivision (c)(1)(E); in 2007 it was renumbered without substantive change to subdivision (c)(1)(B)(v). (Stats. 2007, ch. 565, § 4.) For simplicity, all quotations in judicial decisions referring to section 366.26, subdivision (c)(1)(E) have been changed to reflect the current numbering.

appropriate, allowing for a bonding study or other relevant expert testimony." (*Id.* at p. 633, fn. 4.)

In this case, the juvenile court set the section 366.26 hearing for January 3, 2020. In December 2019, the court continued the section 366.26 hearing to February 18, 2020. On January 21, 2020, mother, who at some point in the prior seven weeks came to be represented by a new attorney, filed a motion for bonding studies and asked to have the motion placed on the calendar for January 30, 2020. The juvenile court denied the request to place the motion on the January 30, 2020, calendar and ordered that the motion would be addressed at the existing future court date, which was the section 366.26 hearing on February 18, 2010.

At the beginning of the section 366.26 hearing, the court heard argument and denied the bonding study motion. The court recognized that mother had changed counsel, and the court stated the change in counsel was due to a reorganization within her counsel's firm. But the court found that did not mean that two weeks before the trial date the court should entertain a motion for bonding studies. The court stated that a study would delay permanency and stability for the minor and would not do anything more than buy time for mother. The court also stated that it was a "late-in-the-game type of filing; frankly, because it was filed and asked to be set for a hearing, sort of shoehorned in by mother's counsel, strong-armed, if you will, and that's not how we conduct our courtroom."

26

Besides finding the motion untimely, the juvenile court found a study would not be useful or beneficial for the court's fact-finding, because the judicial officer at the section 366.26 hearing had overseen one or two prior hearings and was familiar with the reports and lengthy record. The court noted that the minor was three-and-a-half years old at the time and was not particularly articulate. The court stated the minor had serious medical issues and found any disturbance to his emotional well-being would be detrimental to him. The court appeared to recognize that child therapists might be helpful for overcoming the latter two issues, but reiterated that the study would not be helpful to the court as the trier of fact. The court further found that the study would not be beneficial or helpful for its evaluation of the sibling relationships on behalf of the minor.

If mother renews her request for bonding studies on remand, the court should give due consideration to such a request with *Caden C.* in mind. We express no opinion on whether bonding studies are warranted but offer three observations regarding the juvenile court's reasons for denying mother's prior requests.

First, nothing in *Caden C.* purported to restrict the broad discretion a juvenile court exercises over whether to order a bonding study. Even after *Caden C.*, a court that believes a bonding study is unnecessary because the record adequately reflects the nature of the relationship between a minor and his or her parent may still properly deny a request for a study. (*In re B.D.*, *supra*, 66 Cal.App.5th at p. 1228, fn. 3 ["Although bonding

27

studies and expert reports are often very informative [citation], they are not always required because a juvenile court can infer detriment based on the loss of a 'significant, positive relationship' with a parent"]; *In re Richard C.* (1998) 68 Cal.App.4th 1191, 1196 [" 'At the time the court makes its determination [regarding a bonding study], the parent and child have been in the dependency process for 12 months or longer, during which time the nature and extent of the particular relationship should be apparent' "].)  However, *Caden C.*'s admonition that juvenile courts should seriously consider allowing such studies does move the needle towards favoring such studies.  (*People v. Baldwin* (2018) 30 Cal.App.5th 648, 657 [" 'Supreme Court dicta is not to be blithely ignored.  Indeed, such dicta is said to be "persuasive" [citation] and to "command[ ] serious respect." ' [Citation.] 'As one appellate court has advised:  "Generally speaking, follow dicta from the California Supreme Court" ' "].)

Second, the juvenile court missed the mark in relying on the fact that the minor could not articulate himself well.  As *In re Jacob S.*, *supra*, 104 Cal.App.4th at page 1018, noted in the context of the sibling relationship exception, when "the strength of a bond between very young siblings is difficult to determine because of the young age of the children involved, court-ordered sibling bond studies may be appropriate.  Such studies would be helpful—in some cases might even be indispensable—in determining the applicability of section 366.26, subdivision (c)(1)[(B)(v)]."  The same is true when evaluating a child's bond with a parent.  When children are younger and have more

difficulty expressing themselves, like the minor here, there is more of a need for expert analysis, not less.

Finally, the timing of mother's request, while not ideal, was not so late as to bar it. Mother filed her request on January 21, 2020, about one month in advance of the section 366.26 hearing date, and she tried to have the motion heard several weeks in advance of the hearing date. The juvenile court evidently believed her attempt to have the motion heard in advance of the hearing was contrary to local practice, but that does not change the fact that mother's new counsel filed the motion a month in advance to avoid delaying the section 366.26 hearing. The juvenile court is correct that mother's change in counsel did not necessarily entitle her to a continuance of the existing section 366.26 hearing. But it is noteworthy that, assuming the court's explanation at the hearing for the change in counsel is correct, mother did not voluntarily change lawyers. Mother's court-appointed law firm changed the lawyer assigned to her case, which was beyond mother's control. Leaving aside the question of whether her prior counsel was ineffective for failing to request the study earlier, as mother argues in the alternative, at the very least the delay does not appear to have been purely an attempt to push off the section 366.26 hearing, as the juvenile court appears to have construed it.

While we are cognizant of the bias of hindsight, we cannot help but note that while the section 366.26 hearing began in February 2020, the juvenile court did not conclude the hearing and issue a ruling until well over a year later, in April 2021.

29

Given that span of time, it is difficult to accept the juvenile court's reliance on the minor's interest in quickly achieving permanency as a basis for denying the request for a study. A great deal of that delay, of course, was due to the onset of the COVID-19 pandemic and the changes to court procedures that it necessitated, both of which were unforeseeable and unavoidable. But much of the delay was also due to the need for multiple days of testimony from each of four witnesses; mother's need for an interpreter for her native language of Dari and the court's difficulties supplying a suitable interpreter; and, not least, the court's congested docket. These issues contributed to the hearing being held on 16 separate days with gaps between hearing days of more than a month in some instances.

Even under a best-case scenario without the pandemic and interpreter difficulties, the hearing could have been expected to span multiple court days and therefore take several calendar weeks, if not longer, to complete. In such circumstances, the juvenile court should have considered not just the timeliness of the request for bonding studies relative to the beginning of a section 366.26 hearing, but also the timeliness relative to the conclusion of the hearing and whether bonding studies could have taken place concurrently with the first hearing dates such that they would not delay the end of the hearing.

If the record of the prior hearing here is any guide, the section 366.26 hearing on remand will take several court days. Thus, if mother again requests bonding studies and the timeliness of the request remains at issue, the juvenile court in

30

exercising its discretion should determine whether such studies can be completed with little or no delay to the minor's permanency beyond what the court's schedule itself will require.

## B. Sibling testimony

The sibling relationship exception to termination of parental rights, set forth at section 366.26, subdivision (c)(1)(B)(v), is similar to the beneficial relationship exception. (*In re L. Y.L.* (2002) 101 Cal.App.4th 942, 951.) "Reflecting the Legislature's preference for adoption when possible, the 'sibling relationship exception . . . only applies when the juvenile court determines that there is a "compelling reason" for concluding that the termination of parental rights would be "detrimental" to the child due to "substantial interference" with a sibling relationship.' [Citation.] Indeed, even if adoption would interfere with a strong sibling relationship, the court must nevertheless weigh the benefit to the child of continuing the sibling relationship against the benefit the child would receive by gaining a permanent home through adoption." (*In re Celine R.* (2003) 31 Cal.4th 45, 61.) "To determine the significance of the sibling relationship, the court considers the factors set forth in section 366.26, subdivision (c)(1)[(B)(v)]." (*In re L. Y.L.*, at p. 952.) Those factors, which are not exclusive (*id.* at p. 952, fn. 6), are "whether the child was raised with a sibling in the same home, whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to

31

the benefit of legal permanence through adoption." (§ 366.26, subd. (c)(1)(B)(v).)

" 'While a parent in a juvenile dependency proceeding has a due process right to a meaningful hearing with the opportunity to present evidence [citation], parents in dependency proceedings "are not entitled to full confrontation and cross-examination." [Citation.] Due process requires a balance. [Citation.] The state's strong interest in prompt and efficient trials permits the nonarbitrary exclusion of evidence [citation], such as when the presentation of the evidence will 'necessitate undue consumption of time.' [Citation.] The due process right to present evidence is limited to relevant evidence of significant probative value to the issue before the court. [Citations.]' [Citation.] . . . [I]t does not violate due process for a trial court to require an offer of proof before conducting a contested hearing on one of the statutory exceptions to termination of parental rights." (*In re Tamika T.* (2002) 97 Cal.App.4th 1114, 1122, italics omitted [considering beneficial relationship exception]; *In re Earl L.* (2004) 121 Cal.App.4th 1050, 1053 [applying *Tamika T.* to sibling relationship exception].)

At the beginning of the section 366.26 hearing, mother indicated she intended to call three of the minor's siblings to testify about the minor's relationship with them, for the purposes of establishing the sibling relationship exception. When the juvenile court asked for an offer of proof regarding the siblings' testimony, mother said she expected them to describe their significant common experiences, the closeness of their bonds,

32

interactions they had with the minor, how he had connected with them, and any emotional displays he had made. Mother argued all three siblings' testimony was necessary because the minor might have stronger or weaker relationships with each sibling. The juvenile court denied mother's request to examine the youngest siblings because it found, based on mother's offer of proof, the younger siblings did not have any information that was not duplicative or cumulative regarding the visits with the minor.

Mother contends the younger siblings' testimony would not be duplicative and the exclusion of their testimony violated her due process right to present evidence, because the sibling relationship exception applies to each sibling individually. We disagree. The sibling relationship exception does apply to each sibling separately. (See *In re Jacob S.*, *supra*, 104 Cal.App.4th at pp. 1017–1018 [considering different siblings' relationships separately].) But neither in the lower court nor here has mother explained what information the two younger siblings had that was not within the oldest sibling's or mother's knowledge. Mother was present for each of the visits, and she does not contend the younger siblings visited with the minor separately from the oldest sibling. She offers no reason to think the other siblings had relationships with the minor that were materially different from that of the oldest sibling. Additionally, the young age of the two younger siblings (11 and 9 years old when the juvenile court ruled), when considered with the minor's own young age and the two years he had been out of the house at the time, makes it unlikely they would have observed some revealing

33

nuance of the minor's behavior and attitude toward his siblings. Mother and the oldest sibling could adequately describe the minor's activities and emotional reaction to the visits with all of the siblings, making the younger siblings' testimony on such points duplicative and cumulative.

### C. Adoptability

Mother argues the juvenile court's finding by clear and convincing evidence that the minor was adoptable is not supported by substantial evidence. Mother contends variously that the agency's adoption assessment was inadequate for being out of date, not discussing the minor's relationship with mother and his siblings, and not describing the minor's contacts with his extended family; the minor was still medically fragile and therefore not generally adoptable; and the court improperly excluded evidence regarding a legal impediment to adoption by the caregiver. Because the agency will presumably prepare a new assessment for the new section 366.26 hearing on remand and the minor's health conditions may have changed by the time of such a hearing, we will only address mother's last contention regarding a legal impediment to the caregiver's ability to adopt the minor.

At a section 366.26 hearing, "[t]he juvenile court may terminate parental rights only if it determines by clear and convincing evidence that it is likely the child will be adopted within a reasonable time." (*In re Carl R.* (2005) 128 Cal.App.4th 1051, 1060.) "The adoptability issue at a section 366.26 hearing focuses on the dependent child, e.g., whether his or her age,

34

physical condition, and emotional state make it difficult to find a person willing to adopt." (*In re A.A.* (2008) 167 Cal.App.4th 1292, 1311.) "The likelihood of adoptability may be satisfied by a showing that a child is generally adoptable, that is, independent of whether there is a prospective adoptive family ' " 'waiting in the wings.' " ' [Citation.] However, the case law also recognizes that the juvenile court may properly consider a prospective adoptive parent's willingness to adopt as evidence that the child is likely to be adopted within a reasonable time." (*Id.* at p. 1313, italics omitted.) If a juvenile court finds a child is adoptable "only because a particular family is willing to adopt," then the court must consider legal impediments to adoption by the particular family. (*In re G.M.* (2010) 181 Cal.App.4th 552, 562.) If a court's adoptability finding is based in part on the willingness or commitment of an identified prospective adoptive parent, then evidence of legal impediments to adoption by that parent is "relevant" to a finding of adoptability, but a court does not have a duty to inquire into such impediments. (*Id.* at pp. 562, 564.)

"On review, we determine whether the record contains substantial evidence from which the juvenile court could find clear and convincing evidence the child was likely to be adopted within a reasonable time." (*In re Michael G.* (2012) 203 Cal.App.4th 580, 589; see *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011 ["When reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains

35

substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true"].)

During the hearing, mother attempted to ask the social worker about a potential legal impediment to the caregiver's ability to adopt relating to her marital status. Mother's argument rested on Family Code section 8603, subdivision (a), which states, "A married person, not lawfully separated from the person's spouse, shall not adopt a child without the consent of the spouse, provided that the spouse is capable of giving that consent." The Agency reported in February 2020 that the minor's caregiver was living with her boyfriend and adolescent children and was in the process of divorcing her husband. Mother sought to ask the social worker whether the caregiver was still in the process of getting a divorce. The juvenile court sustained the Agency's objections to the questions, and it explained that the evidence was not relevant because the court was not deciding who would ultimately adopt the minor. Mother raised the issue again in her closing argument, and the juvenile court again told her to move on because the argument was not relevant.

At the conclusion of the hearing, the juvenile court found by clear and convincing evidence that the minor was generally and specifically adoptable. The court found the minor was generally adoptable because he was in good mental, physical, and emotional health. The court recognized that the minor was medically fragile but nonetheless found he had no impediments to adoption because he had made a lot of improvement. The court also found the minor was specifically adoptable based on the

caregiver's willingness to adopt. The court reaffirmed its earlier rulings that the caregiver's marital status was not relevant or on point because the court was not relying solely on a finding of specific adoptability based on the caregiver's willingness to adopt. The court then concluded the minor was specifically adoptable because there was no evidence that the caregiver's spouse would not sign the necessary paperwork.

On appeal, mother renews her argument about the caregiver's legal impediment to adoption. Mother contends the Agency should have confirmed whether the caregiver was divorced or legally separated. Mother further contends the juvenile court erred by preventing her from asking the social worker about this topic.

We agree with mother that the juvenile court erred. The juvenile court's adoptability determination rested in part on its finding that the minor was specifically adoptable by the caregiver. Under *In re G.M.*, *supra*, 181 Cal.App.4th at pages 562 and 564, although the juvenile court did not have a duty to inquire in possible legal impediments to the minor's adoption by the caregiver, evidence of such impediments was relevant and the juvenile court should have allowed mother to explore the topic. Likewise, the Agency's "preliminary assessment of the eligibility and commitment" (§§ 361.5, subd. (g)(1)(D), 366.21, subd. (i)(1)(D), 366.22, subd. (c)(1)(D)) of the caregiver as an adoptive parent in the section 366.26 report should have addressed whether Family Code section 8603 would prevent the caregiver from adopting the minor. However, the juvenile court's

37

failure to allow mother to present evidence of the caregiver's potential legal impediment to adoption was not necessarily fatal to the court's overall adoptability finding, because the juvenile court also found the minor generally adoptable. So long as substantial evidence supported that general adoptability finding (which we need not decide), the juvenile court's order would have remained valid. (*In re G.M.*, at p. 564.)

## DISPOSITION

The juvenile court's order is reversed. The matter is remanded for further proceedings not inconsistent with this opinion.

BROWN, J.

WE CONCUR:

POLLAK, P. J.
STREETER, J.

*In re A.K.* (A162558)